CHESBROUGH v. BOSTON ELEVATED RY. CO.

BOSTON ELEVATED RY. CO. v. CHESBROUGH (two cases).

(Circuit Court of Appeals, First Circuit. February 20, 1920.)

Nos. 1427–1429.

1. SHIPPING ⟨⟩58(3)—OWNER ENTITLED TO DAMAGES FOR TIME STEAMER WAS OUT OF COMMISSION DUE TO CHARTERER'S NEGLIGENCE.

Where a ship was chartered to a company for whom she had been carrying coal while under charter to another, and during the charter was out of commission from repairs made necessary by the company's negligence, though it was not shown whether the damages occurred before or during charter, and the charterer deducted for the time vessel was out of commission, the owner can recover the amount deducted, not as freight unlawfully deducted, but as damages for loss occasioned by the company's negligence.

2. SHIPPING ⟨⟩58(3)—OWNER ENTITLED TO DAMAGES FOR TIME STEAMER WAS OUT OF COMMISSION DUE TO RESPONDENT'S NEGLIGENCE.

Where a steamer was damaged by charterer's negligence, and was out of commission during a subsequent charter party between the same parties, for purpose of repairing such damages, and charterer deducted for the time out of commission from the freight money, held, that the owner may recover damages for the time out of commission, caused by respondent's negligence, but cannot recover money withheld as part of the freight charged.

3. SHIPPING ⟨⟩49(3)—CHARTER PARTY REQUIRES DEDUCTION FOR LOSS OF TIME TO BE MADE FROM MINIMUM YEARLY TONNAGE.

Under a charter party providing that certain deductions for loss of time by the vessel might be made by deducting the average tonnage for

---

such days from the minimum yearly tonnage on which freight should be paid, etc., *held*, that such deductions should be made from the minimum yearly tonnage, although the vessel actually carried a greater tonnage.

4. SHIPPING ⚙⇒178—CHARTER PARTY MAKING OWNER NOT LIABLE FOR DEMURRAGE DURING STRIKE PREVENTS DEDUCTIONS FROM FREIGHT MONEY.

   Under a charter party making the owner not liable for demurrage due to strikes on board the vessel, the charterer cannot make deductions from the freight money for days the vessel was out of commission due to such strikes.

5. SHIPPING ⚙⇒51—REFUSAL TO COMPLY WITH RENEWED CHARTER PARTY NOT JUSTIFIED.

   An owner's refusal to comply with the renewal of a second charter party is not justified by the charterer's unauthorized deductions from freight money earned under the first charter party between the same parties, where all the charterer's deductions under the second charter party were properly made.

   Brown, District Judge, dissenting.

Appeals from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Libel by Fremont B. Chesbrough against the Boston Elevated Railway Company, with cross-libel by the Boston Elevated Railway Company against Fremont B. Chesbrough. From a decree for libelant in the first proceeding, both parties appeal, and the libelant appeals from an adverse decree in the second proceeding. Decree in first proceeding affirmed, as modified, and decree in second proceeding reversed and remanded.

See, also, 250 Fed. 922.

Rupert L. Mapplebeck, of Boston, Mass. (Gaston, Snow, Saltonstall & Hunt, of Boston, Mass., on the brief), for Boston Elevated Ry. Co.

G. Philip Wardner, of Boston, Mass., for Chesbrough.

Before BINGHAM and JOHNSON, Circuit Judges, and BROWN, District Judge.

BINGHAM, Circuit Judge. Nos. 1427 and 1428 are cross-appeals from a decree of the United States District Court for Massachusetts in a libel in personam brought by Fremont B. Chesbrough against the Boston Elevated Railway Company to recover (1) a balance due it as charter money for the use of the steamer Kennebec, and (2) damages for injuries to the steamer's tank top and other structural work alleged to have been caused by the respondent's negligence while discharging coal from the vessel's hold.

No. 1429 is an appeal from a decree of that court in a cross-libel in personam brought by the Boston Elevated Railway Company against Fremont B. Chesbrough to recover damages for an alleged breach of a second charter party due to withdrawing the steamer from the service of the charterer.

In the first proceeding a decree was entered in the District Court in favor of the libelant for $25,954.25. From this decree the libelant appeals, claiming that the amount awarded him was too small, and

the respondent appeals, claiming that nothing should have been awarded the libelant, or, in any event, that the sum awarded was too great. In the cross-libel the Elevated Company appeals on the ground that the withdrawal of the ship was without justification.

The Kennebec was built on the Great Lakes in 1901 and came to the coast in 1904. She was owned by Chesbrough and had an average cargo capacity for coal of 3,400 gross tons. From 1904 to May 31, 1906, she was chartered to Jewett, Bigelow & Brooks and was exclusively engaged in carrying coal to Boston consigned to the Elevated Company. In April, 1907, she was chartered directly to the Elevated Company, for a period of one year from June 1, 1907, to carry coal between Boston and ports north of Cape Hatteras. In March, 1908, a second charter party was made, between the same parties and having the same provisions, for a period of 2 years from June 1, 1908, to June 1, 1910, with an option to the charterer to extend the contract for two or three years. Under both charter parties the Elevated Company was to discharge the cargo free of expense to the steamer, and in fact discharged her at Lincoln Wharf from the time she came to the coast in 1904 to June, 1910.

According to the provisions of the two charter parties the steamer was chartered to the Elevated Company for successive voyages between the above-named ports. The owner agreed that the vessel should be tight, staunch, strong, and in every way fitted for the voyages, would receive on board the contemplated cargoes, and should be in condition to transport coal as quickly as she did for the year ending May 31, 1906. The Elevated Company, on its part, agreed to furnish the vessel with a full cargo of coal each voyage, and pay for the use of the vessel during the voyages the sum of 70 cents for each ton of coal of 2,240 pounds actually transported in her from ports above named to Boston, delivered alongside wharf, and was to bear the expense of loading and discharging the cargo, while the owner of the steamer was to pay the trimming charges. Section 3 of the contract provides for 3 lay days for loading and three for discharging the vessel, but subject to a strike clause relieving the Elevated Company from demurrage if prevented from loading by strikes either at the mines or on the railroads, or any cause beyond its control. Section 5 contains general provisions relieving the Elevated Company from accountability in case it was unable to furnish the coal by reason of strikes or other causes beyond its control. Section 4 contemplates the possibility of strikes on board the steamer and provides that the steamer or owner is not to be held for demurrage in case of such a strike not under the control of the owner. Section 6 is also made in contemplation of strikes, and permits the owner, in case of a strike lasting 3 days or more and interfering with loading, to postpone the charter and load elsewhere until notified by the Elevated Company that it is again ready to furnish cargo, and apparently provides that if the owner, under such circumstances, does not seek cargo elsewhere, but permits the vessel to lie in the harbor more than 3 consecutive days, the Elevated Company shall be allowed a rebate for each day so lost in excess of 3 days equal to 70 cents per ton for the average

tonnage transported per day by the vessel for the year ending May 31, 1906. Section 7 of the contract reads:

"The party of the second part covenants to pay in any event seventy cents a ton for at least one hundred and eight thousand (108,000) gross tons, except as herein provided, in case the vessel be at any time out of commission.

"If a less amount than one hundred and eight thousand (108,000) gross tons is in fact transported (except as otherwise herein provided) the rate paid per ton is to be so increased that the total amount of money received by the vessel shall equal the amount the said vessel would receive for one hundred and eight thousand (108,000) gross tons transported at seventy cents per ton (less the amount the vessel pays at port of loading as trimming charges, viz. seven cents [7] per ton), if the vessel is in commission the entire year.

"If the vessel is not in commission the entire year because of fault of the party of the first part (not herein otherwise provided for) or if there be a loss of time or of use of the vessel through deficiency of men or stores, fire, damage, or need of repairs, preventing the running of the vessel for more than twenty-four running hours, the average tonnage transported per day by the vessel during the year ending May 31, 1906, multiplied by the number of days the vessel is prevented from running, as herein stipulated, is to be deducted from the one hundred and eight thousand (108,000) gross tons for which the party of the second part shall pay.

"The party of the second part shall in no event pay for more than one hundred and eight thousand (108,000) gross tons, even if a larger number than that be in fact transported."

By section 9 the Elevated Company agreed to furnish coal for the vessel's use out of the coal transported and at the same price it paid for it. The charter contains other provisions, but it is not apparent that any of them are material in the consideration of these cases.

Between January 21 and January 31, 1908, the vessel was out of commission 7 days having its hold beams, stanchions and hatch coamings repaired.

Between October 18, 1907, and November 23, 1907, the vessel was out of commission 33 days by reason of a general strike of marine engineers affecting her crew.

In the first year (1908-1909) of the second charter party the vessel was out of commission 27 days, a part of which loss of time, to wit, 271 hours and 55 minutes, in April, 1909, was due to repairs on the vessel's tank top.

In the second year (1909-1910) of the second charter party the vessel was out of commission $16^7/_{12}$ days, due to repairs.

Acting under section 7 of the charter party the Elevated Company, in computing the freight due the libelant in each of the three years, deducted from 108,000 tons a certain number of tons, estimated as directed in that section, on account of the vessel being out of commission, and paid the freight thus found due, claiming that it had the right to make deductions not only as to the time the vessel was out of commission due to the strike, but as to the other periods when she was out of commission. The owner objected to all the deductions, claiming (1) that the time the vessel was out of commission on account of repairs to the hold beams, stanchions, and hatch coamings and to the tank top was due to the negligence of the company in the operation of its unloading plant or diggers, and (2) that under the provisions of

the charter party it had no right to deduct for loss of time due to a strike on board the vessel.

As to the 7 days between January 21 and January 31, 1908, when the vessel was out of commission during the first charter party for repairs to the hold beams, stanchions, and hatch coamings, the District Court found that the loss of time for these repairs, to the extent of at least 2 or 3 days, was occasioned by the company's negligence in operating its discharging apparatus; that to that extent the deduction was not justified and decreed that the libelant should recover the sum of $517.33, with interest from the 1st day of June, 1908, to the date of the decree, June 23, 1919, in the sum of $343.42.

As to this portion of the decree the respondent contends that there was no evidence from which the court below was warranted in finding that any of the repairs made during this period were due to its negligent conduct in the operation of its discharging apparatus. The libelant, on the other hand, contends not only that there was evidence showing that the repairs to the extent covered by the 2 or 3 days allowed by the court were necessitated by the respondent's negligence in handling its discharging apparatus, but that all the repairs made during the 7 days were necessitated by the respondent's negligent conduct.

[1] After an examination of the evidence we are satisfied that the court below, in its conclusion as to the matter now under consideration, was right, and that he was warranted in finding that the respondent, through negligence in handling its discharging apparatus, damaged the hold beams, stanchions, and hatch coamings; and we are not satisfied that the repairs made during the balance of the 7 days in excess of the 2 or 3 days were not due to ordinary wear and tear rather than to the negligent conduct of the respondent. But, notwithstanding this, we think that the respondent, under the terms of the charter party, was entitled to deduct from the freight money earned during the year 1907–1908 the whole 7 days the vessel was out of commission during that year, and that the libelant should be remitted to his right in tort to recover the damages he sustained to the hold beams, stanchions, and hatch coamings because of respondent's negligence, including those he sustained by reason of loss of time for repairs during the 2 or 3 days. The damage occasioned the hold beams, stanchions, etc., by the respondent's negligence occurred after the vessel came to the coast in 1904, and between that time and January 21, 1908. From the time she came to the coast in 1904 to June 1, 1907, the vessel was under charter to Jewett, Bigelow & Brooks, and from June 1, 1907, to January 21, 1908, to the respondent. Although the damage in question was occasioned by the respondent's negligence, it does not appear but that it all happened while the vessel was under charter to Jewett, Bigelow & Brooks. If any of it was incurred from June 1, 1907, to January 21, 1908, the evidence does not show how much was then sustained. If none of the damage occurred between the last-named dates and under the first charter party, the negligence occasioning it was not the breach of a contractual obligation of the respondent to use due care, but of a duty imposed by

law due to the relationship of the parties. Therefore, while the libelant's right of recovery as for breach of contract is on the facts doubtful, his right as for the breach of an imposed duty is plain. It is for this reason that we think the libelant's right of recovery as to this matter is in tort and that the deduction for loss of time while these repairs were being made under the first charter was proper. The evidence discloses that the parties adjusted the damages for the cost of the repairs but not for the loss of time. That the damages settled for were thus limited is shown by Exhibits 26 and 27. We see no reason, therefore, why the libelant should not recover the sum of $517.33 and interest, not as freight money unlawfully withheld, but as damages suffered by reason of the respondent's negligent conduct.

[2] As to the 27 days in the first year of the second charter party, during which the vessel was out of commission for repairs, the court below found that between 11 and 12 days, or 271 hours and 55 minutes, of this time was required for repairs to the tank top and that the damage to the tank top was caused by the negligence of the respondent's employés in discharging the vessel early in the year 1908; that down to February, 1908, the tank top was in fair operating condition, but that between February and June there was a great change for the worse, and that this change was so rapid and extensive as to show that it was due to the improper and negligent handling of the digger buckets by the respondent's crew. In the spring of 1908 the Elevated Company changed from a two-men control of the operating levers in the discharging towers to a one-man control. During this period, also, there was a strike at the respondent's discharging plant and it was operating its diggers with green men unaccustomed to the work. These facts go far to show the cause of the rapid and extensive damage done to the tank top at this time.

The amount of the damage to the tank top thus found by the court to have been inflicted, having been agreed upon by the parties at $3,000, it was decreed that the libelant recover that sum, together with interest to the date of the decree, amounting to $1,675.26.

The respondent's contention as to this matter also is that there was no evidence warranting the finding of negligence. We are, however, satisfied that there was ample evidence to support it, and that the damage to the tank top occurred in the spring of 1908, during the first charter party, and was due to respondent's negligence.

Having found that between 11 and 12 days of the 27 days during which the steamer was out of commission (1908–1909) was required for repairs to the tank top and that these repairs were occasioned by the negligence of the respondent, the court below held that the respondent was not entitled to make deductions from the freight on that account. But our view of this, as in regard to the loss of time occasioned by repairs to the stanchions, etc., is that the respondent was entitled to deduct this loss of time from the freight money earned the first year of the second charter party and that the libelant is entitled to recover the sum hereafter allowed of $2,435.36 and interest thereon from the 1st day of June, 1909, to the date of the decree,

June 23, 1919, as a part of his damages due to the injury to the tank top, and, if necessary, may amend his libel for this purpose.

The reason why this sum of $2,435.36 and interest is not recoverable as a part of the freight money and was properly deducted from the sum due as freight at the end of the year 1908-1909, is that the loss of time, upon which these figures are based, was not occasioned by the respondent's breach of any obligation assumed by it under the second charter party, but was occasioned either by the breach of an obligation arising out of the first charter party or the violation of a duty imposed by law due to the relationship of the parties during the existence of the first charter party.

[3] As to the repairs made during the balance of the 27 days the court found that it was not established that they were made necessary by negligence on the part of the respondent and held that they fell within the general obligation of the owner of the steamer to keep her staunch and seaworthy and that the time required for them ought to be deducted from the freight, unless the owner was relieved by the fact that during the year in question (1908-1909) the vessel transported more than 108,000 tons. As to this matter the libelant's contention in the court below and here is that, under the charter party, the respondent had no right to make deductions for loss of time, whether occasioned by his fault or not, provided the vessel had transported, during the year, more than 108,000 tons. The respondent's contention below and here is that loss of time by the vessel for more than 24 running hours, due to need of repairs, was deductible from the freight money under the provisions of section 7 of the charter, and that the deductions should be made from 108,000 tons, whether the vessel, as to a given year, carried more or less than 108,000 tons. The court below, however, did not adopt the contention of either of the parties, but held that, if the steamer actually transported more than 108,000 tons, deductions for time out of service chargeable to her (that is, the 15 or 16 days remaining out of the 27 days) were to be made, not from 108,000 tons, but from the amount actually transported, and on this basis of computation decreed that the libelant was entitled to recover as wrongly withheld the sum of $5,254.19, with interest from June 1, 1909, to the date of the decree, June 23, 1919, in the sum of $3,172.66.

The question, therefore, is presented whether, under the terms of the second charter party, if the vessel carries more than 108,000 tons, no deductions for loss of time by the vessel are to be made, or, if made, are to be deducted from 108,000 tons or from the amount actually carried.

We think, in view of the provisions of section 7 of the charter party, that the deductions authorized therein are to be made from 108,000 tons, whether the vessel, in a given year, carries 108,000 tons or more or less than that amount. Paragraph 1 of section 7, when properly understood, means that the party of the second part covenants to pay in any event (i. e., whether the vessel carries 108,000 tons or more or less than that amount) 70 cents a ton for at least 108,000 gross tons in case the vessel be at any time out of commission,

"except as herein provided"; that is, in case she is out of commission for any cause other than those provided for in the charter, no deduction for such loss of time is to be made, but for loss of time due to causes specified in the charter, deductions shall be made however much or little the vessel transports. And paragraph 3 of section 7 points out the specific causes authorizing deductions for loss of time. In that paragraph it says:

"If the vessel is not in commission the entire year because of fault of the party of the first part (not herein otherwise provided for), or if there be a loss of time or of use of the vessel through deficiency of men or stores, fire, damage, or need of repairs, preventing the running of the vessel for more than twenty-four running hours, the average tonnage transported per day by the vessel during the year ending May 31, 1906, multiplied by the number of days the vessel is prevented from running, as herein stipulated, is to be deducted from the one hundred and eight thousand (108,000) gross tons for which the party of the second part shall pay."

This paragraph states that deductions for loss of time, when made, shall be from 108,000 gross tons. The charter contains no provision authorizing deductions for loss of time from the amount of coal actually carried, be it more or less than 108,000 gross tons. To reach the conclusion in this case, that deductions should be made from the amount actually carried, would result in introducing into the charter not only a provision the parties never agreed to, but one in conflict with the express provisions of paragraph 3, section 7.

The libelant's contention to the effect that the words "in any event" in paragraph 1 of section 7 mean in the event of the ship carrying 108,000 tons or less is plainly not correct as such a construction would place a restriction upon the language used and leave one of the contingencies liable to arise, and which the parties undoubtedly had in view, unprovided for.

To support his contention—that no deductions for loss of time due to causes specified in the charter are to be made if the vessel carries more than 108,000 gross tons in a year—would require that we should read out of paragraph 1 of section 7 the words "in any event," which contemplate the possibility of the vessel's carrying more than 108,000 tons, and the reading into paragraph 3 of section 7 the words of paragraph 2, "If a less amount than 108,000 gross tons is in fact transported," neither of which can be done on any reasonable construction of the language used in section 7 or any other provisions of the charter.

It is evident from a reading of the charter that what the charterer wanted was the service of the vessel each year for a full year; and what the owner wanted was the payment of a fixed sum for the service of his vessel for a full year, however little she carried. This they provided for in the second paragraph of section 7, where it is stipulated in substance that the owner shall be paid at the rate of 70 cents a ton for 108,000 tons, if the vessel is in commission throughout the year. It is also apparent that the parties contemplated that the vessel might be, for one cause or another, out of commission during each year of the charter. They had in mind certain definite causes for which she might be out of commission. They also con-

templated that there might be other causes that they did not then have in mind for which she might be out of commission. Therefore they provided (paragraph 1, section 7) that the ship should be paid 70 cents per ton for at least 108,000 tons, although she was not in commission throughout the year, provided the time lost was due to other causes than these which they specifically had in mind. But if the time lost was due to the specific causes they had in mind and which they specified in the charter (paragraph 3, section 7), then she should be paid 70 cents per ton for 108,000 tons, less deductions for the time so lost. When thus construed full meaning is given to the various provisions of the charter.

Holding, as we do, that the contention of the respondent as to this matter is correct, the decree of the court as to the libelant's right of recovery for deductions made from the freight money in the year 1908–1909 must be modified; and, as modified, libelant will recover, instead of $5,254.19 and interest thereon, the sum of $2,435.36, with interest thereon from the 1st day of June, 1909, to the date of the decree, June 23, 1919. And he recovers this sum, not on the ground that it was wrongly deducted from the freight money earned in 1908–1909, but as a part of the damages he sustained by reason of the respondent's negligent conduct, which resulted in injury to the tank top during the previous charter party, 1907–1908.

In the second year (1909–1910) of the second charter party more than 108,000 tons of coal was transported, and the vessel was out of commission during the year $16^7/_{12}$ days for repairs which were not made necessary by the respondent's negligence. The court below, in making up its decree, made the deduction from the number of tons actually carried, the same as it did for the 15 or 16 days the vessel was out of commission in 1908–1909 for repairs not due to the negligence of the company, and allowed the libelant to recover, on this basis of computation, $407.75, with interest from the 1st day of June, 1910, to the date of the decree, June 23, 1919. But as the deduction was improperly made from the number of tons actually carried, instead of from the 108,000 tons stipulated for in section 7, the allowance of $407.75 and interest thereon was improper. The decree of the court below should be modified by eliminating this sum.

[4] There remains to be considered in Nos. 1427 and 1428 the right of the respondent to deduct from the freight money for the 33 days the vessel was out of commission during the first charter party (1907–1908), due to a strike on board the vessel. In the court below it was found and ruled that "the strike was general in character and affected the engine room force of a large proportion of freight steamers on this coast," and "was eventually settled by a compromise between the labor union and the shipowners," and therefore was a strike on board the steamer, not under the control of the party of the first part, within the meaning of section 4 of the charter party; that the respondent, in deducting this loss of time from the freight money, acted without right, as it was not the fault of the owner of the vessel, within the meaning of paragraph 3 of section 7, and was expressly provided against in section 4; that, while the use made of the

word "demurrage" in section 4 was unusual, the obvious purpose of the section was "to relieve the steamer, in the contingency covered by it (i. e., strikes on board her), from some payment or penalty for her idleness to which she would otherwise be subject"; and, "as the only penalty for her nonoperation was reduction in the amount of tonnage for which she would be paid on the year's business, it would seem that clause 4 was intended to relieve her from such reductions in respect to idleness caused by strikes on board her." He held, therefore, that "the steamer was not to be penalized for nonoperation due to such strikes." We think that the conclusion reached with respect to this matter was right.

[5] As previously pointed out, the charter party for the 2 years beginning June 1, 1908, gave the respondent an option to renew the contract on the same terms for a further period of 2 or 3 years, and it appears that the respondent, on February 7, 1910, within the time limited by section 12 of the charter party, exercised its option by notifying the libelant that it extended the charter for a period of 2 years, and on June 1, 1910, notified him to have the steamer report for loading, until further advised, to Davis Coal & Coke Company, Baltimore, Md. On February 9, 1910, the libelant wrote the respondent, in answer to its letter of February 7:

"That unless the Boston Elevated Railway Company settles for the damage to the tank top of steamer Kennebec, by their unloading plant at Lincoln power station, and the repayment for the deductions made by you from the charter money due steamer Kennebec, June 1, 1909, that the steamer will be withdrawn from the service of the Boston Elevated Railway Company."

And on June 7, 1910, wrote the respondent:

"That the steamer Kennebec has been (as by previous notice given you), withdrawn from the service of the Boston Elevated Railway Company until freight moneys due steamer, and unpaid by Boston Elevated Company, are paid; also damages to steamer by unloading plant at Lincoln Wharf power station are paid."

In the court below it was ruled that, inasmuch as the respondent—

"refused to pay the freight money and other sums to which the steamer was entitled and which were substantial in amount, her owner was justified in refusing to extend the charter party and in withdrawing her from service."

As we understand the situation, the second charter party, upon the libelant's receipt of the notification of February 7, 1910, was extended for the additional period of 2 years from June 1, 1910, and the question is whether the libelant was justified in terminating the contract June 1, 1910, and withdrawing the steamer from service for the unexpired 2 years.

It is evident that the libelant did not withdraw the steamer from service on the ground that she could not reasonably continue therein because of negligent conduct on the part of the respondent in discharging cargo, for the steamer continued in the service of the respondent for 2 years after the damage to her tank top was sustained and for more than 2 years after the damage to her hold beams, stanchions, and hatch coamings had been repaired, and the evidence does

not show that during this period of 2 years she sustained any damage due to the negligence of the respondent in discharging cargo.

Furthermore, the damages to the hold beams, etc., and to the tank top, arose under the first contract, and their nonpayment could in no view be regarded as a ground for rescission of the second contract (1908–1910), to which they had no relation. And the same is true in regard to the deductions from the freight money for the 33 days of time lost due to the strike in 1907–1908 on board the vessel under the first contract, and for loss of time during the same year while the repairs were being made to the hold beams, stanchions, etc., under the same contract. As we have held that all the deductions for loss of time in both years of the second charter party were properly made, the nonpayment of these sums was not a breach of that contract or its extension and afforded no ground for its rescission.

In Nos. 1427 and 1428 the decree of the District Court is modified to conform to this opinion, and, as modified, is affirmed, with costs in this court to the respondent, the Boston Elevated Railway Company.

In No. 1429 the decree of the District Court is reversed, and the case is remanded to that court, for further proceedings not inconsistent with this opinion, with costs to the appellant.

BROWN, District Judge (dissenting). I am unable to agree to the interpretation which the majority opinion gives to this charter party, and especially to the interpretation and application of section 7 of the charter party, quoted on page 270 in that opinion.

Ordinarily, upon the settlement of the year's account under a time charter at a fixed rate per ton of coal the vessel would be credited with the full amount of coal transported at the contract rate. She would then be charged with any loss of time not allowed to her under the provisions of the charter party, or under ordinary legal principles, and the balance would be the amount payable in satisfaction of the year's business. In the present case, however, it is provided by the final clause of section 7:

"The party of the second part shall in no event pay for more than 108,000 gross tons, even if a larger number than that be, in fact, transported."

Section 2 of the charter party expressly provides for payment of the sum of 70 cents for each ton of coal of 2,240 pounds actually transported. While the final clause of section 7 cuts down the obligation to pay for all coal transported, it does not follow that it cuts down the right of the vessel to credit for the full amount carried in order to offset, on an accounting, any deductions to which the charterer may be entitled on account of loss of time. The limit is upon the total amount which is payable by the charterer on the year's business. In case the balance struck exceeds the amount which would be payable for 108,000 tons at 70 cents, the charterer is relieved from payment of the excess.

The majority of the court are of the opinion that the vessel can be credited only with the amount of 108,000 tons, and that all deductions for loss of time must be made from this arbitrarily fixed amount of

108,000 tons, rather than from any larger amount actually carried by the vessel. This seems to me to result from a misinterpretation of the language and of the purpose of section 7 of the charter party. This misinterpretation appears in two paragraphs of the majority opinion:

"Paragraph 1 of section 7, when properly understood, means that the party of the second part covenants to pay in any event (i. e., whether the vessel carries 108,000 tons or more or less than the amount) 70 cents a ton for at least 108,000 gross tons in case the vessel be at any time out of commission, 'except as herein provided'; that is, in case she is out of commission for any cause other than those provided for in the charter, no deduction for such loss of time is to be made, but for loss of time due to causes specified in the charter, deductions shall be made however much or little the vessel transports. * * *

"Therefore they provided (paragraph 1, section 7) that the ship should be paid 70 cents per ton for at least 108,000 tons although she was not in commission throughout the year, provided the time lost was due to other causes than those which they specifically had in mind. But if the time lost was due to the specific causes they had in mind and which they specified in the charter (paragraph 3, section 7), then she should be paid 70 cents per ton for 108,000 tons, less deductions for the time so lost."

But paragraph 1, which is thus distinctly interpreted as a provision for payment in case the vessel be at any time out of commission, is as follows:

"The party of the second part covenants to pay in any event seventy cents a ton for at least one hundred and eight thousand (108,000) gross tons, except as herein provided, in case the vessel be at any time out of commission."

It seems very clear that this paragraph is not an agreement to pay in case the vessel is out of commission, but to pay at least an agreed amount *except* in case the vessel is out of commission.

Paragraph 2 concludes with the words "if the vessel is in commission the entire year."

Paragraph 3 begins with the words "If the vessel is not in commission the entire year," and provides for deductions from the amount payable under the first paragraph of section 7. It is a provision for reducing the guaranteed tonnage in case the vessel be at any time out of commission.

I agree with the contention of counsel for the owner, Chesbrough, that the deductions authorized by the third paragraph must be confined to relieving the charterer, under the conditions enumerated in it, from the full obligation imposed on him by the first two sentences, namely, of paying 70 cents a ton on 108,000 tons when less than that amount was transported. When the amount of tonnage carried is so large that the vessel is not obliged to resort to the guaranty for compensation, she is, as under an ordinary time charter for coal carrying, entitled to credit for the full amount carried, and after proper deductions for lost time, to payment of the full balance for the year's business, except as that payment is cut down by the final clause of section 7, which forms no part of the guaranty, but seems to have been inserted for the benefit of the charterer, and in consideration of the guaranty contained in the previous part of section 7.

What seems to me to be an error in the majority opinion is in the

assumption that the arbitrarily fixed amount of tonnage, 108,000 tons, which is the outside limit of the guaranty for a year's business, is to be taken as the limit which is to be credited to the vessel on an accounting for the settlement of the year's account. That the vessel is guaranteed this amount is, of course, no reason for limiting her credit to that amount. If there is a limit, it must be found in the final clause—that the party of the second part shall in no event pay for more than 108,000 gross tons, even if a larger number than that be in fact transported. But this is a limitation upon the amount to be paid on the year's business, and does not reasonably require a departure from the ordinary method of determining what that amount is, namely, crediting the value of the service rendered, and charging for time or service lost, and stating the balance due.

For the libelant Chesbrough a strong argument is made to the effect that after the charterer has received all the coal he has agreed to pay, for there is no justification for any deduction either from the amount actually carried or from the amount of 108,000 gross tons.

Though the argument is worthy of careful and detailed discussion it does not seem that this would now be useful. If any deductions are permissible I agree with the opinion of the District Court that they should be made from the amount actually transported, and not from the arbitrary amount fixed by section 7.

I therefore agree with the decision of the District Court that, because of substantial and unauthorized deductions, and of insistence upon claims of rights to which the charterer was not entitled under the charter party, and to which it would not be entitled during the period of renewal, the refusal to renew the charter was justified.

In Nos. 1427 and 1428 I am unable to agree to the modifications of the decree of the District Court. In No. 1429 I am of the opinion that the decree of the District Court should be affirmed.